1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DONNA E. ALBRECHT, | ) | 1:11-cv-01319 GSA |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S** |
| | ) | **SOCIAL SECURITY COMPLAINT** |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## BACKGROUND

Plaintiff Donna E. Albrecht ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income benefits pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (*See* Docs. 10 & 11.)

## FACTS AND PRIOR PROCEEDINGS[2]

In October 2008, Plaintiff filed an application for supplemental security income benefits, alleging disability beginning October 1, 2001.  *See* AR 125-128.  Plaintiff's application was denied initially and on reconsideration; thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 71-74, 78-82, 84-87.  ALJ Stephen W. Webster held a hearing and issued an order denying benefits on October 1, 2010, finding Plaintiff was not disabled.  AR 11-19.  On May 10, 2011, the Appeals Council denied review.  AR 3-5.

**Hearing Testimony**

ALJ Webster held a hearing on September 14, 2010, in Fresno, California.  Plaintiff appeared and testified.  She was represented by attorney Dennis Bromberg.  Vocational Expert ("VE") Cheryl Chandler also testified.  AR 24-52.

Plaintiff was born on August 24, 1961; she was forty-nine years old on the date of the hearing.  AR 27.  She is five feet, eight inches tall, and weighs between 250 and 260 pounds.  AR 28.  Plaintiff has two children, ages twenty-four and nineteen.  AR 28.  She is not married and lives alone.  AR 28.  While she does have a valid driver's license, Plaintiff does not drive often.  She is "afraid to drive a lot" and relies on her boyfriend to drive.  AR 28-29.

Plaintiff is able to see to her personal grooming needs, can cook, do laundry and perform housework.  Her boyfriend does the yard work.  AR 29.  She watches television for about two hours a day.  AR 29.  Typically she will have the radio on all day, listening to music.  AR 29-30.  Plaintiff will read about two hours a day, and uses the computer about "half the day."  AR 30.  She enjoys sewing, crocheting, crafting and writing poetry.  AR 30.  She has about twenty unfinished projects currently because she loses focus after about fifteen to twenty minutes, or "until the next time [she has] to go to the bathroom."  AR 45.  She does not visit with family and friends, go to movies, or attend church services regularly.  AR 30.

---

[2]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1    After earning a high school diploma, Plaintiff attended one year of college.  Additionally,

2    she received vocational training as a nursing assistant.  AR 31.

3    While Plaintiff has never served time in jail, there was an incident three and a half years

4    ago involving the use of methamphetamine.  It involved a physical altercation with her boyfriend;

5    he was put in jail and she attempted suicide.  AR 31, 37-38.

6    When asked when she last worked, Plaintiff indicated it was 2001.  She has recently

7    worked "here and there" as a massage therapist, earning about $300 a month seeing clients in her

8    home.  AR 31-32.  Plaintiff does not receive welfare or food stamp benefits, but sometimes visits

9    charities offering free food.  AR 32.

10   Plaintiff suffers from diabetes and diabetic neuropathy.  She feels pain and numbness in

11   her hip, legs, shoulder, hands and feet, left knee and "whole left side."  AR 32.  The pain in her

12   left hip is constant and shoots down her leg on a daily basis.  AR 40-41.  Further, Plaintiff suffers

13   from a bipolar disorder, attention deficit disorder, obsessive compulsive disorder, and high blood

14   pressure.  AR 33.

15   When Plaintiff received treatment at Community Hospital two weeks prior to the hearing,

16   she was treated for elevated blood sugar, and insulin was administered.  AR 33-34.  She also

17   received pain medication that helps with her hip.  In addition to prescription medication, Plaintiff

18   takes over-the-counter Motrin, in doses between 800 to 1,200 milligrams.  AR 34.

19   Plaintiff feels numbness in her hands, feet, hips and pelvic area.  She underwent carpal

20   tunnel surgery about sixteen years ago, and in April 2010 had a cyst removed from her left wrist.

21   She feels "electric shocks shooting up [her] arm and tingling up to [her] shoulders and neck."

22   AR 38.  Pain also shoots up her arms and she feels numbness in both hands.  AR 38-39.  When

23   asked to explain what part of her hand gets numb, Plaintiff replied "from the forearm all the way

24   down to the fingers," including her whole hand.  AR 39.  As a result of the numbness, she often

25   drops things like dishes or books, or other items around the house.  AR 39-40.  When she feels

26   pain in her hip, there is numbness in her left thigh and a "loss of feeling in [her] left leg."  AR 40.

27

28                                                      3

When she sits down, Plaintiff's feet "get cold and numb." The numbness also occurs when she is standing still. AR 40.

Due to the hip pain, Plaintiff can sit for about twenty minutes before getting "fidgety" and needing to move around. AR 34-35. She can stand for about twenty to thirty minutes before needing to take a break and get off her feet. AR 35. Plaintiff estimated she could walk "just to the end of [her] street and back." AR 35. When she was asked what the heaviest weight she could lift would be, Plaintiff estimated she could lift twenty pounds because she can lift her dog who weighs twenty pounds. AR 35.

Plaintiff believes the diabetes causes her to use the restroom a lot, and because the insulin was increased to keep her blood sugar under control, she becomes "constantly thirsty." AR 41. She estimated she uses the bathroom about every half hour. AR 41-42. Because she feels thirst, she drinks water "constantly" to stay hydrated. AR 42. She added that if she does not "have water with [her, she's] panicked." AR 42.

Plaintiff has been treated for bipolar disorder for nine years. AR 42. She indicated that she was diagnosed "epileptic" as a small child, and when she was later diagnosed with bipolar disorder, her stepmother, a registered nurse, commented that the diagnosis "finally explain[ed] the way" Plaintiff behaved. AR 43. She is more often depressed than manic. AR 43. When she is manic, Plaintiff cannot hold still, her mind races and she is "hyper." She can go without sleeping, but will make herself lie down. AR 47. When manic, Plaintiff attempts big projects "like cleaning out a whole closet." AR 47. She goes "up and down a lot." AR 48. The episodes last a couple days and occur monthly. The longest manic episode lasted a week; two days is the shortest. AR 48-49. She tends to get more done when she is manic. AR 49. When she comes down from the manic episode, it is a "hard depression, uncontrollable crying" and she feels as though she would rather die. AR 49. She cries every day, sometimes for no reason. AR 49.

Plaintiff thinks of suicide "all the time" and does not want to be a burden to her sons. AR 45. Prior to the incident involving her boyfriend, Plaintiff used to cut herself with a knife on her

4

hand.  She has thought about suicide her entire life, and continues to do so.  AR 46.  Plaintiff

claims the only thing that has stopped her from seeing through her plans to commit suicide is her

"fear of God and [her] two children."  AR 46-47.

Sleep is a problem because Plaintiff wakes every hour to use the bathroom, never getting

a "deep sleep."  AR 43.  She feels exhausted all the time.  AR 43-44.  She uses padding "because

[she] frequently wet[s] the bed" but does not like to wear diapers.  AR 44.  While she has a

healthy appetite, her appetite can be "[u]p and down."  AR 44.  Similarly, her energy level

requires that she push herself, and yet she is "wound up all the time."  She thinks of "ten things at

the same time" but then does not finish tasks.  AR 44.

With regard to work history specifically, Plaintiff was asked about working for a

company called San Joaquin Chemicals in 1999.  She explained her uncle owns the company,

and her duties included bookkeeping, accounts payable and receivable, and photocopying.

Further, Plaintiff indicated she "was fired three times from that job by [her] uncle's girlfriend."

She attributes that to her health problems and the fact she was "constantly using the restroom."

AR 36.  Plaintiff also worked for Continental Labor and Bennett Frost.

VE Chandler identified Plaintiff's past work as that of a general clerk position, DOT[2]

209.562-010, SVP[3] of three, semiskilled and light. AR 50.

The VE was asked to consider a hypothetical worker of Plaintiff's age, education and

work history, who could lift twenty pounds occasionally and ten pounds frequently, and could sit,

stand and/or walk for six hours in an eight-hour day.  AR 50.  VE Chandler indicated that such an

individual is capable of performing Plaintiff's past relevant work as actually and generally

performed.  AR 50-51.

In a second hypothetical, the VE was asked to assume the same individual as previously

considered, with the additional factor of the need to use the restroom once every half hour.  AR

_____

[2]"DOT" refers to the Dictionary of Occupational Titles.

[3]"SVP" refers to specific vocational preparation.

1   51. VE Chandler indicated that the hypothetical individual would be unable to perform

2   Plaintiff's past work, nor was there any work in the national economy that the hypothetical

3   individual could perform.  AR 51.  The same result would occur with an additional limitation of

4   an inability to maintain attention for longer than one hour at a time.  AR 51.

5   **Medical Record**

6   The entire medical record was reviewed by the Court.  AR 209-314.  The medical

7   evidence will be referenced below as necessary to this Court's decision.

8   **ALJ's Findings**

9   Using the Social Security Administration's five-step sequential evaluation process, the

10  ALJ determined that Plaintiff did not meet the disability standard.  AR 11-19.

11  More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful

12  activity since October 27, 2008, the date her application was filed.  AR 13.  Further, the ALJ

13  identified diabetes, diabetic neuropathy, obesity, arthritis and hip pain as severe impairments.

14  AR 13-14.  Nonetheless, the ALJ determined that the severity of the Plaintiff's impairments did

15  not meet or exceed any of the listed impairments.  AR 15-16.

16  Based on his review of the entire record, the ALJ determined that Plaintiff has the

17  residual functional capacity ("RFC") to lift twenty pounds occasionally and ten pounds

18  frequently, and can sit, stand and/or walk for six hours in an eight-hour workday.  AR 16-18.

19  Next, the ALJ determined that Plaintiff was capable of performing her past work as a

20  general clerk.  AR 18.  Therefore, the ALJ found Plaintiff was not disabled.  AR 18-19.

21  **SCOPE OF REVIEW**

22  Congress has provided a limited scope of judicial review of the Commissioner's decision

23  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

24  this Court must determine whether the decision of the Commissioner is supported by substantial

25  evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla,"

26  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

27

28  6

1  *Weinberger*, 514 F.2d 1112, 1119, n.10 (9th Cir. 1975).  It is "such relevant evidence as a

2  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

3  401.  The record as a whole must be considered, weighing both the evidence that supports and

4  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993,

5  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

6  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

7  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

8  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

9  substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

10  Cir. 1987).

11  **<u>REVIEW</u>**

12  In order to qualify for benefits, a claimant must establish that he is unable to engage in

13  substantial gainful activity due to a medically determinable physical or mental impairment which

14  has lasted or can be expected to last for a continuous period of not less than twelve months.  42

15  U.S.C. § 1382c(a)(3)(A).  A claimant must show that he has a physical or mental impairment of

16  such severity that he is not only unable to do her previous work, but cannot, considering his age,

17  education, and work experience, engage in any other kind of substantial gainful work which

18  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

19  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

20  Cir. 1990).

21  In the instant appeal, Plaintiff argues[4] that the ALJ's findings are not supported by

22  substantial evidence and are not free of legal error because the ALJ (1) lacked the evidence

23  necessary to find Plaintiff had past relevant work as a general clerk; (2) erroneously determined

24  Plaintiff's bipolar disorder was a medically determinable impairment rather than a severe

25  _____

26  [4]For reasons that are unclear, Plaintiff filed two opening briefs.  (*See* Docs. 15 [4/9/12] & 16 [5/9/12].)
   After review, the Court has concluded the briefs are identical.  Therefore, the Court will refer only to the latter, or

27  docket entry number 16, Plaintiff's Opening Brief filed May 9, 2012.

28

1   impairment; and (3) should have ordered a consultative examination regarding her physical

2   impairments.  (Doc. 16 at 9-17.)

3                                          **DISCUSSION**

4          A.      *The Past Relevant Work Finding*

5          Plaintiff argues that the ALJ erred when he found that Plaintiff's prior work as a general

6   clerk between 1978 and 1985, and "sporadically between 1999 and 2001" amounted to past

7   relevant work.  This is so, Plaintiff argues, because that work activity did not occur within the

8   previous fifteen years or "last[] long enough to learn how to do the work" thereby constituting

9   substantial gainful activity.  (Doc. 16 at 9-11.)  Defendant counters that Plaintiff has failed to

10  meet her burden to establish that she cannot perform her past relevant work.  (Doc. 16 at 5-7.)

11         Social Security Regulation ("SSR") 82-61 provides "that work experience applies (is

12  relevant) when it was done within the last 15 years, lasted long enough for the person to learn to

13  do it and was substantial gainful activity."  The regulation also provides as follows:

14              Three possible tests for determining whether or not a claimant retains the
        capacity to perform his or her past relevant work are as follows:

15                      1. Whether the claimant retains the capacity to perform a
                past generic, occupational

16              past relevant job based on a broad generic, occupational
                classification of that job, e.g., "delivery job," "packaging job," etc.
                Finding that a claimant has the capacity to do past relevant work on

17              the basis of a generic occupational classification of the work is
                likely to be fallacious and unsupportable.  While "delivery jobs," or

18              "packaging jobs," etc., may have a common characteristic, they
                often involve quite different functional demands and duties

19              requiring varying abilities and job knowledge.
                        2. Whether the claimant retains the capacity to perform the

20              particular functional demands and job duties peculiar to an
                individual job as he or she actually performed it. Under this test,

21              where the evidence shows that a claimant retains the RFC to
                perform the functional demands and job duties of a particular past

22              relevant job as he or she actually performed it, the claimant should
                be found to be "not disabled."

23                      3. Whether the claimant retains the capacity to perform the
                functional demands and job duties of the job as ordinarily required

24              by employers throughout the national economy. (The Dictionary of
                Occupational Titles (DOT) descriptions can be relied upon -- for

25              jobs that are listed in the DOT -- to define the job as it is usually
                performed in the national economy.) It is understood that some

26              individual jobs may require somewhat more or less exertion than
                the DOT description.  A former job performed in by the claimant

27

28                                              8

may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

SSR 82-61. It is a claimant's burden to show she does not have the RFC to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & 416.920(e); *see also Lewis v. Apfel*, 236 F.3d 503, 515 (9th Cir. 2001).

As the *Lewis* court explained,

[s]ubstantial gainful activity is work done for pay or profit that involves significant mental or physical activities. 20 C.F.R. §§ 404.1571-404.1572 & 416.971-416.975. Earnings can be a presumptive, but not conclusive, sign of whether a job is substantial gainful activity. Monthly earnings averaging less than $300 generally show that a claimant has not engaged in substantial gainful activity. 20 C.F.R. §§ 404.1574(b)(3) & 416.974(b)(3). At the other end of the spectrum, monthly earnings averaging more than $500 generally show that a claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1574(b)(2) & 416.974(b)(2). (If a claimant's average monthly earnings fall between $300 and $500, then the Commissioner will consider other information listed in the regulations.)

*Lewis v. Apfel*, 236 F.3d at 515.

Here, ALJ Webster found as follows:

The claimant reports that she performed general office work 5 days a week for 8 hours a day, from 1978 through 1985. The record (and testimony) also reveals that the claimant worked sporadically from 1999 through 2001 in various temporary office work positions.
In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed. The vocational expert testified at the hearing that the position of General Clerk (DOT 209.562-010) is a semi-skilled, light position. When asked if someone of the claimant's age, education, past relevant work experience, with the residual functional capacity as stated above could perform the duties of a general clerk, the vocational expert replied that the claimant could in fact engage in her past relevant work as a general clerk.

AR 18.

The relevant fifteen year time frame involves that period between 1995 and 2010.  A review of Plaintiff's earnings report reveals that she did not earn any income in 1995, 1996, or 1997.  AR 133-134.  However, in 1998, Plaintiff earned a total of $6,308.63 from employers including Office Max, Home Depot, Careerstaff Services Corporation, and Raquel Montero/Mimis Homes.  AR 134.  Moreover, in 1999, she earned wages from Home Depot, Bennett Frost Personnel Services, Inc., and San Joaquin Chemical & Distributor Co., Inc, for a total yearly income of $8,816.40.  AR 133-135.  In 2000, Plaintiff earned $2,084.56 from Continental Labor Resources, Inc., and San Joaquin Chemical & Distributor Co., Inc.  AR 133, 135.  Finally, in 2001, she earned a total of $4,883.71, again from Continental Labor Resources, Inc., and San Joaquin Chemical & Distributor Co., Inc.  AR 133, 135-136,

Significantly, Plaintiff testified that while employed at San Joaquin Chemical, a company owed by her uncle, her duties included bookkeeping, accounts payable and receivable, filing and photocopying.  AR 36.  She acknowledged that the job she "worked the most time with was . . . San Joaquin" Chemical.  AR 37.  Plaintiff's testimony is supported by the record.  She earned $8,186 in 1999 and $5,166 of that sum was earned at San Joaquin Chemical.  AR 135. Assuming Plaintiff worked for Home Depot and Bennett Frost during the first quarter of 1999, or even the first two quarters of 1999, the relevant calculations reveal substantial gainful activity as a general clerk during the period: $574 and $861 on average per month, respectively.

Plaintiff's argument is not persuasive that there was insufficient evidence of substantial gainful activity and past relevant work.  Because Plaintiff earned an average of more than $700 per month in 1999[5] - and 1999 falls within the fifteen year period prior the hearing in September 2010 - Plaintiff has failed to meet her burden of establishing she cannot perform her past relevant work, and more particularly, that the ALJ erred in finding to the contrary.  Further, in light of the foregoing, it was not error for the ALJ to also consider Plaintiff's older work experience as a

---

[5]8,816 divided by 12 = 735.

10

1 clerk. *See* AR 155-156. In sum, the ALJ's findings are supported by substantial evidence and

2 are free of legal error.

3             **B.**     ***The Finding at Step Two***

4        Next, Plaintiff argues the ALJ erred by failing to find her bipolar disorder was a severe

5 impairment. (Doc. 16 at 12-14.) The Commissioner contends Plaintiff has not met her burden of

6 establishing that her bipolar disorder is severe. (Doc. 17 at 8-9.)

7        At step two of the sequential evaluation process, the ALJ must conclude whether Plaintiff

8 suffers from a "severe" impairment. The regulations define a non-severe impairment as one that

9 does not significantly limit the claimant's physical and mental ability to do basic work activities.

10 An impairment is not severe "if the evidence establishes a slight abnormality that has 'no more

11 than a minimal effect on an individual's ability to work.'" *Smolen v. Chater*, 80 F. 3d 1273,

12 1290 (9th Cir. 1996). To satisfy step two's requirement of a severe impairment, the claimant

13 must prove the existence of a physical or mental impairment by providing medical evidence

14 consisting of signs, symptoms, and laboratory findings; the claimant's own statement of

15 symptoms alone will not suffice. 20 C.F.R. §§ 404.1508, 416.908. The effects of all symptoms

16 must be evaluated on the basis of a medically determinable impairment which can be shown to

17 be the cause of the symptoms. 20 C.F.R. §§ 404.1529, 416.929. An overly stringent application

18 of the severity requirement violates the statute by denying benefits to claimants who do meet the

19 statutory definition of disabled. *Corrao v. Shalala,* 20 F.3d 943, 949 (9th Cir. 1994).

20        The step two inquiry is a *de minimis* screening device to dispose of groundless or

21 frivolous claims. *Bowen v. Yuckert,* 482 U.S. 137, 153-154 (1987). Further, the ALJ must

22 consider the combined effect of all of the claimant's impairments on his ability to function,

23 without regard to whether each alone was sufficiently severe. 42 U.S.C. § 423(d)(2)(B). The

24 combined effect "shall be considered throughout the disability determination process. *Id.*

25        The adjudicator's role at step two is further explained by SSR 85-28:

26           A determination that an impairment(s) is not severe requires a careful evaluation
       of the medical findings which describe the impairment(s) and an informed judgment

27

28                              11

about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.

SSR 85-28.

Here, the ALJ identified Plaintiff's diabetes, diabetic neuropathy, obesity, arthritis and hip pain as severe impairments.  AR 13.  However, the ALJ also determined that Plaintiff's bipolar and epilepsy were non-severe.  AR 13-14.  In pertinent part, he reasoned as follows:

> The claimant's medically determinable mental impairment of Bipolar Disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe.
> In making this finding, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. These four broad functional areas are known as the "paragraph B" criteria.
> The first functional area is activities of daily living.  In this area, the claimant has no limitation.  The claimant reports that she is able to do routine household chores, drive a car, shop for clothes and groceries, watches television and use the computer for several hours per day.  These activities are indicative of an ability to perform a full range of activities of daily living, and therefore the claimant is found to have no limitations in this area.
> The next functional area is social functioning.  In this area, the claimant has mild limitation.  She reports she has no close friends except for her boyfriend.  She indicates that she is afraid to go anywhere alone, and that she does not get along with her family.  Giving the claimant the benefit of the doubt, I find that she has mild limitation in social functioning.
> The third functional area is concentration, persistence or pace.  In this area, the claimant has no limitation.  The claimant reports that she is able to read, watch television, and work on the computer for several hours per day.  She also stated that she likes to sew[,] crochet and do "crafting" projects.  At the hearing, she testified that she was able to read for several hours, and spends half the day on the computer.  She listens to music and writes poetry.  These statements are indicative of a capability to engage in activities requiring concentration, persistence or pace on a regular basis, and therefore I find the claimant has no limitations in this area.
> The fourth functional area is episodes of decompensation.  In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.  The record does not indicate significant, sustained loss of adaptive functioning during any period at issue.
> Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is non-severe.
> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential

12

evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

AR 13-14, internal citations omitted.

Plaintiff claims the ALJ came to his conclusion that her bipolar disorder was non severe "without relying on a shred of medical evidence." (Doc. 16 at 12.) The ALJ's findings expressly reference the Function Report - Adult form completed by Plaintiff and her testimony at the administrative hearing. Importantly, that information comports with Dr. Damania's findings following a psychiatric evaluation. *See* AR 283-285. More particularly, Dr. Damania's mental status examination findings include the following:

She was pleasant, cooperative and articulate. Speech was normoproductive and there was no evidence of a speech defect. Mood was euthymic. She smiled and laughed during the course of the interview but informed the interviewer that within an hour she could become very tearful and that most people did not see that side of her. Affect was broad and appropriate to the thought content and situation. She denied any suicidal or homicidal ideation and impulse control and frustration tolerance were within normal limits. There was no evidence of hallucinations or delusions. There was no evidence of a thought disorder. She was oriented to time, place and person. Memory for recent and past recall was intact. Attention span was within normal limits. She was of average intelligence. Insight and judgment were adequate.

AR 285. Dr. Damania's diagnosis was mood disorder, not otherwise specified. AR 285. The doctor noted "no evidence of any emotional lability or deterioration." AR 286. She concluded that Plaintiff was capable of: understanding, remembering and carrying out three and four step job instructions in a work-like setting; responding appropriately to coworkers, supervisors and the public; and, responding appropriately to usual work situations and dealing with changes in routine. AR 286. Notably too, while ALJ Webster expressly referenced "Exhibit 5E" (third party function report) and "Exhibit 6E" (adult function report) in discussing Listing 12.00C, the ALJ also noted the fact he had "careful[ly] considered the entire record" in making his findings. AR 13.

1    It is a claimant's burden to prove the existence of a physical or mental impairment by

2    providing medical evidence consisting of signs, symptoms, and laboratory findings; the

3    claimant's own statement of symptoms alone will not suffice.  20 C.F.R. § 416.908.  Here,

4    Plaintiff failed to prove the existence of a bipolar disorder by failing to provide medical evidence

5    consisting of signs, symptoms and laboratory findings.

6    This Court's review of the medical record, and in particular the references to a bipolar

7    disorder, reveal that Plaintiff herself is the source of any bipolar diagnosis in this record.  *See* AR

8    215 ("hx bipolar"); 218 (diagnosis recorded as adjustment disorder, depressed mood [not bipolar

9    disorder]); 232 ("hx of DM & bipolar"); 233 ("pt reports . . . history of Bi-polar"); 277-278

10   (indicated she was "not taking BP meds"); 311 (patient medical history: "Bipolar"); 312

11   ("Bipolar" & "manic-depressive episodes daily").  Plaintiff contends her treating physician

12   indicated she has "a bipolar condition of mixed nature" and cites to various pages in the medical

13   record that purportedly "describe [her] as suffering from a bipolar disorder."  (Doc. 16 at 13.)  As

14   an example, Plaintiff contends page 274 of the administrative record describes her bipolar

15   disorder.  To the contrary however, a review indicates that Plaintiff herself reported a bipolar

16   condition by stating she was "not on BP meds b/c does not want to get 'hooked.'"

17   With regard to Sam A. Castro, M.D., Plaintiff contends the ALJ erred in assigning no

18   weight to the doctor's opinion that included references to a bipolar disorder.  (Doc. 16 at 13.)

19   Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

20   who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

21   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

22   physicians).  As a general rule, more weight should be given to the opinion of a treating source

23   than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

24   647 (9th Cir.1987).  At least where the treating doctor's opinion is not contradicted by another

25   doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

26   1391, 1396 (9th Cir.1991).  Even if the treating doctor's opinion is contradicted by another

27

28                                         14

1   doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

2   reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

3   F.2d 499, 502 (9th Cir.1983).

4        ALJ Webster considered Dr. Castro's opinion and concluded as follows:

5             Sam Castro, M.D., submitted two "medical reports" indicating the
        claimant suffers from "bipolar, mixed" with the comment "this condition is
6        lifelong and varies in severity.  This opinion is given no weight as it is merely a
        "check-box" form, does not contain any record of examination or treatment and
7        the doctor's opinion is without substantial support from the other evidence of
        record, which obviously renders it less persuasive.
8

9   AR 17.  Because Dr. Castro's opinion was contradicted by those of Shireen Damania, the

10  consulting psychiatrist, as well as the state agency physicians, the ALJ was required to provide

11  specific and legitimate reasons for rejecting the opinion.  *See AR 281-300.*  Here, ALJ Webster

12  did precisely that when he provided three specific and legitimate reasons: (1) the opinion is

13  provided on a check-the-box form; (2) the opinion is not supported by any record of examination

14  or treatment; and (3) other medical evidence does not substantiate the doctor's opinion.  Those

15  reasons are proper.  *See Batson v. Commissioner, Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th

16  Cir. 2004) (ALJ properly discounted treating physician's opinion where, *inter alia*, opinion was

17  in form of checklist); *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (a brief and

18  conclusory form opinion which lacks supporting clinical findings is a legitimate reason to reject a

19  treating physician's conclusion); *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007)

20  (controlling weight need not be given if opinion inconsistent with other substantial evidence in

21  the record).

22       The Court has carefully reviewed the relevant records.  At page 303 of the administrative

23  record, Dr. Castro indicates that Plaintiff has a mental incapacity that prevents or substantially

24  reduces her ability to work full time, and that incapacity is expected to last permanently.  Asked

25  to list the diagnosis and prognosis of the patient, Dr. Castro wrote "BI-POLAR MIXED THIS

26  CONDITION IS LIFE LONG AND VARIES IN SEVERITY."  He recorded an onset date of

27

28                                          15

1   "1999."  The report is dated November 12, 2008.  At page 301 of the administrative record, Dr.

2   Castro indicates that Plaintiff has a mental incapacity that prevents or substantially reduces her

3   ability to work full time, and that incapacity is expected to last permanently.  Asked to list the

4   diagnosis and prognosis of the patient, Dr. Castro wrote "Bipolar, mixed" and recorded an onset

5   date of March 1, 2001.  The report is dated December 1, 2008.  AR 301.  If Dr. Castro had

6   diagnosed bipolar disorder in 1999 or 2001, it is reasonable to assume that diagnosis would be

7   based upon objective medical findings, and yet, Dr. Castro provided no such medical records or

8   findings to support his conclusory opinion that Plaintiff suffers from a disabling bipolar mental

9   disorder.  In a letter dated December 2, 2008, and marked "SECOND REQUEST," Dr. Castro

10  was asked to provide records concerning Plaintiff, including consultations, CT/MRI reports,

11  history, lab tests, office notes, operative notes, PT progress notes, pathology reports, and x-ray

12  reports.  AR 270-271.  The request was signed and returned.  The doctor indicated he did not

13  have the information requested.  AR 271.

14        In sum, Plaintiff's argument lacks merit.  The ALJ's findings in this regard is supported

15  by substantial evidence and is free of legal error.

16        **C.    *Development of the Record***

17        Lastly, Plaintiff argues that the ALJ should have ordered a consultative examination after

18  he "characterized the record as not containing the opinions of examining or treating physicians"

19  regarding her physical impairments.  (Doc. 16 at 15-17.)  The Commissioner contends the ALJ

20  was not required to obtain an additional consultative examination in this matter as there was no

21  conflict or ambiguity present.  (Doc. 17 at 9-10.)

22        Title 20 of the Code of Federal Regulations section 416.917 provides as follows:

23              If your medical sources cannot or will not give us sufficient medical
            evidence about your impairment for us to determine whether you are disabled or
24          blind, we may ask you to have one or more physical or mental examinations or
            tests. We will pay for these examinations. However, we will not pay for any
25          medical examination arranged by you or your representative without our advance
            approval. If we arrange for the examination or test, we will give you reasonable
26          notice of the date, time, and place the examination or test will be given, and the

27

28                                           16

1    name of the person or facility who will do it. We will also give the examiner any
2    necessary background information about your condition.

3    Plainly the statute is discretionary, therefore, ALJ Webster was not required to obtain any

4    particular consultative examination.

5         Normally, a consultative examination is required only if additional evidence is required

6    that is not included within the claimant's treatment records or the treatment records present an

7    ambiguity that requires resolution.  *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001);

8    *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *see also Yanez v. Astrue*, 252

9    Fed.Appx. 792, 793-94 (9th Cir. 2007).

10        Plaintiff argues that the "ALJ characterized the record as not containing the opinions of

11   examining or treating physicians on the insulin dependent diabetes, diabetic neuropathy, obesity,

12   arthritis, and hip pain. [] The ALJ relied on the only evidence in the record, the review of a non-

13   examining physician that saw only part of the record."  (Doc. 16 at 15.)  The Court disagrees with

14   Plaintiff's characterization.

15        ALJ Webster actually stated the following:

16        In terms of the claimant's diabetes and diabetic neuropathy, there is
17   evidence that the claimant has not been entirely compliant in taking prescribed
     medications, which suggests that the symptoms may not have been as limiting as
18   the claimant has alleged in connection with this application.  On March 6, 2008,
     the claimant was seen at Community Regional Medical Center wherein the record
19   reveals, "sugars out of control . . . has been out of medications for a long time . . .
     was shocked and surprised that we needed to administer insulin today.  Jeanette
20   Ryland, M.D., prescribed insulin and metformin.  The record reveals that the
     claimant failed to follow-up on recommendations made by the treating doctor,
21   which again suggests that the symptoms may not have been as serious as has been
     alleged in connection with this application and appeal.  On October 8, 2008, it
22   was reported that "patient is not compliant with medication."  She was again
     advised to control her blood sugar more consistently.  Further, the records from
23   University Medical Center dated January 6, 2010, again show noncompliance with
     medications, "was prescribed insulin but claims to have run out."  In addition, the
24   records from Adult Health Center at Sierra reveal that she is noncompliant with
     recommendations to take blood pressure mediation as well.  Given the
25   claimant['s] allegations of totally disabling symptoms one might expect to see
     some indication in the treatment records of restrictions placed on the claimant by
26   the treating doctors.  These records do not contain any opinions indicating that the
     claimant is disabled, but have merely reported the claimant's subjective
27   complaints and suggested treatment modalities.

28                                      17

1
2
3
        The record reveals relatively infrequent trips to the doctor for the allegedly
disabling symptoms, and relatively conservative treatment for the allegedly
disabling impairments.  Considering the numerous allegations of physically
disabling symptoms, the claimant has not generally received the type of medical
treatment one would expect for a totally disabled individual.

4
5
6
7
        The residual functional capacity conclusions reached by the physicians
employed by the State Disability Determination Services also support a finding of
"not disabled."  Although those physicians were non-examining, and therefore
their opinions do not as a general matter deserve as much weight as those of
examining or treating physicians, those opinions do deserve some weight,
particularly in a case like this in which there exist a number of other reasons to
reach similar conclusions . . ..

8   AR 17-18, internal citations omitted.

9       The record revealed that, with particular regard to Plaintiff's impairments of diabetes,

10  diabetic neuropathy and hypertension, Plaintiff has been non compliant.  *See* AR 242, 265-266,

11  268, 274, 277-278, 311.   "Impairments that can be controlled effectively with medication are not

12  disabling for the purpose of determining eligibility for SSI benefits."  *Warre v. Comm'r of Soc.*

13  *Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).  X-rays of Plaintiff's hips revealed "mild

14  bilateral joint space loss identified at the hips suggests early degenerative change.  No fracture or

15  dislocation is identified."  AR 275; *see also* AR 276 (lumbar spine x-rays showed no fracture or

16  significant degenerative change).  Based on these findings, there was no reason for the ALJ to

17  request a consultative examination regarding Plaintiff's hip pain.  Similarly, the medical record

18  contains no reason that would compel the ALJ to order a consultative examination as a result of

19  Plaintiff's complaints of arthritis.  In fact, the record reveals only mild findings that could

20  possibly be attributed to arthritis.  *See* AR 249-250.

21      In short, a consultative examination regarding Plaintiff's physical impairments was not

22  necessary here because the existing evidence was sufficient to support the ALJ's determination

23  and such an exam was not needed to resolve an inconsistency.  *See* 20 C.F.R. § 416.919a(b).

24  Therefore, no error occurred.

25
26
27
28                                         18

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Donna E. Albrecht.


     IT IS SO ORDERED.

   **Dated:   August 24, 2012**                    **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE

19